**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YASIR AFIFI, <br><br> Plaintiff, <br><br> v. <br><br> LORETTA LYNCH, *in her official capacity as Attorney General, et al.*, <br><br> Defendants. | Civil Action No. 11-0460 (BAH) <br><br> Judge Beryl A. Howell |

**<u>MEMORANDUM OPINION</u>**

The plaintiff, Yasir Afifi, brings suit against Loretta Lynch. in her official capacity as Attorney General of the United States, James Comey, in his official capacity as Director of the Federal Bureau of Investigation (collectively, the "official capacity defendants"), [1] FBI agent Jennifer Kanaan, in her personal capacity, and several unknown FBI agents, also in their personal capacities (collectively, the "individual defendants"), relating to the warrantless installation in 2010 of a wireless GPS tracking device on his automobile. Specifically, the plaintiff seeks relief for violations of his rights under the First and Fourth Amendments of the Constitution, the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*, and the Privacy Act, 5 U.S.C. § 552a. The Court concludes that the individual defendants are entitled to qualified immunity with respect to the alleged constitutional violations, the official capacity defendants have not violated the strictures of the Privacy Act, and the plaintiff lacks standing to bring his APA challenge.

---

[1] The plaintiff originally named former Attorney General Eric Holder and former Director of the FBI Robert Mueller as defendants in this case. Pursuant to Federal Rule of Civil Procedure 25(d), the Court automatically substitutes their successors, Loretta Lynch and James Comey, respectively, as the new defendants.

## I.   BACKGROUND

### A.   Factual Background

On October 3, 2010, the plaintiff, a California resident, brought his car to a repair shop in California for a routine oil change.  *See* Am. Compl. ¶¶ 12, 32, ECF No. 21.  The results of the maintenance were far from routine, however.  During the oil change, the plaintiff discovered "a wire sticking out between the right rear wheel [of his automobile] and exhaust."  *Id.*  The wire was connected to "a smaller black rectangular object that had an antenna."  *Id.*  At first, the plaintiff thought the object might be a "pipe bomb."  *Id.* at ¶ 34.  Nonetheless, upon the plaintiff's request, the mechanic removed the object and the plaintiff returned with it to his home.  *Id.* at ¶¶ 33–34. Later that day, the plaintiff uploaded pictures of the object onto an internet site, whereupon a reader suggested that the object was a GPS tracking device sold exclusively to law enforcement agencies. *Id.* at ¶ 35.

Three days later, multiple FBI agents visited the plaintiff's apartment complex to retrieve the GPS device. *Id.* at ¶ 36.  After the plaintiff left his apartment that day, two unmarked vehicles followed him, turned on their police lights, and pulled him over.  *Id.* at ¶¶ 36–37.  Four individuals wearing bullet-proof vests approached the plaintiff's vehicle.  After initially inquiring after an expired license plate, an FBI agent identifying himself as "Vincent" asked the plaintiff to exit his vehicle.  *Id.* at ¶ 39.  After exiting the vehicle, "Vincent" and an FBI agent named as a defendant in this action, Jennifer Kanaan, engaged the plaintiff in conversation.  *Id.* at ¶ 40. During the exchange, the agents "acknowledged that the device belonged to their agency, that they attached it to [the plaintiff's] vehicle, and that they used the device to monitor [the plaintiff's] movements."  *Id.* at ¶ 43.  The agents also asked the plaintiff other questions, including "whether he was a national security threat, whether he was having financial difficulties, [and] whether he had been to Yemen . . . ."  *Id.*  Eventually, the plaintiff agreed to

return the GPS device to the FBI agents.  *Id.* at ¶ 45.  After returning the GPS device, defendant

Kanaan made several comments to the plaintiff that indicated to the plaintiff that the FBI had

knowledge of the plaintiff's movements, including commenting on certain restaurants at which

the plaintiff ate, a friend with whom he associated, and a new job at which he worked.  *Id.* at

¶ 46.  At the end of the encounter, the plaintiff alleges that defendant Kanaan suggested to him

that he was not a national security threat and that he was no longer of use to the FBI.  *Id.* at ¶ 47.

Following the incident, the plaintiff reported his confrontation with the FBI agents to local and

national media, and the media published numerous stories about the encounter.  *Id.* at ¶ 48.[2]

The FBI's investigation into the plaintiff has since been administratively closed.  *See*

Declaration of Joel D. Dabisch ("Unsealed Dabisch Decl.") at ¶ 8, ECF No. 25-3.  Nonetheless,

the FBI "continues to maintain additional records summarizing [the data collected from the GPS

device], as well as records reflecting other information and actions taken concerning [the]

plaintiff."  *Id.* at ¶ 9.  Following the incident, the plaintiff submitted a FOIA request and received

redacted copies of certain records maintained by the FBI, including newspaper articles

documenting the incident and an FBI report documenting the encounter between the agents and

the plaintiff.  Am. Compl. ¶ 4.

### B.       Procedural Background

Following the encounter, the plaintiff brought suit against both the official capacity

defendants and the individual defendants. *See generally* Am. Compl. ¶¶ 13–14, 17–18.   In Count

I, the plaintiff brings suit under *Bivens v. Six Unknown Named Agents of Federal Bureau of*

*Narcotics*, 403 U.S. 388 (1971), and asserts that the individual defendants violated his Fourth

Amendment rights by subjecting the plaintiff to an unconstitutional warrantless search.  *Id.* at

---

[2] *See, e.g.*, Kim Zetter, *Caught Spying on Student, FBI Demands GPS Tracker Back*, WIRED (October 7, 2010, 10:13 PM), http://www.wired.com/2010/10/fbi-tracking-device/

¶¶ 52–54.  In Count II, the plaintiff alleges that both the individual defendants and the official

capacity defendants violated his rights under the Privacy Act by unlawfully collecting and

maintaining records of his First Amendment activities.  *Id.* at ¶¶ 60–62.  In Count III, the

plaintiff alleges that the actions taken by the official capacity defendants in approving the use of

the GPS device were "arbitrary, capricious, an abuse of discretion, otherwise not in accordance

with law, and contrary to constitutional right and should be set aside as unlawful" under the

APA, 5 U.S.C. § 706.  *Id.* at ¶ 63.  Finally, in Count IV, the plaintiff alleges that the individual

defendants have "create[d] an objective chill on [his] First Amendment activities."  *Id.* at ¶ 69.

Through the instant action, the plaintiff seeks an injunction ordering the defendants to

refrain from attaching a GPS tracking device to his vehicle without a warrant, directing the

defendants to abandon the policy of allowing the use of GPS tracking devices without a warrant,

and ordering the official defendants to expunge all records collected through the use of the GPS

tracking device and any related analyses of those records.  *Id.* (Prayer for Relief).  The plaintiff

further seeks a declaratory judgment that the defendants' use of the GPS tracking device violated

his First, Fourth, and Fifth Amendment rights, and that the maintenance of records of the

plaintiff's First Amendment activities violates the Privacy Act.  *Id.*  Finally, the plaintiff seeks

damages for "the emotional pain, suffering, reputational harm, economic injury, and anxiety"

caused by the defendants' actions.  *Id.*

Previously, this Court stayed proceedings in this matter, pending the Supreme Court's

decision in *United States v. Jones*, 132 S. Ct. 945 (2012), which addressed the constitutionality

of the warrantless use of a GPS device.  Following the decision in *Jones*, the individual

defendants moved to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6), *see*

Defendant Jennifer Kanaan's Motion to Dismiss, ECF No. 22, while the official capacity

defendants sought dismissal under Federal Rule of Civil Procedure 12(b)(1) and summary

judgment, *see* Defendants Holder and Mueller's Motion to Dismiss and for Summary Judgment

on Plaintiff's Amended Complaint, ECF No. 27.

## II.   LEGAL STANDARD

### A.   Motion to Dismiss Under Rule 12(b)(1)

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power

authorized by Constitution and statute.'"  *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013)

(quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Indeed, federal

courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d

116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether

the constitutional and statutory authority exist for us to hear each dispute.'"  *James Madison Ltd.*

*by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. National Academy*

*of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992)).  When the purported lack of jurisdiction stems

from a lack of standing, the court "must assume that [the plaintiff] states a valid legal claim."

*Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir.

2003); *see also Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) ("In evaluating

plaintiffs' standing at the motion to dismiss stage 'we must assume that the plaintiff[s] state[ ] a

valid legal claim and must accept the factual allegations in the complaint as true.'" (quoting

*Holistic Candlers and Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) (alterations

in original)).  The proponent of jurisdiction bears the burden of proving that it exists, *see Khadr*

*v. United States,* 529 F.3d 1112, 1115 (D.C. Cir. 2008), and, in determining jurisdiction, "the

district court may consider materials outside the pleadings."  *Jerome Stevens Pharm., Inc. v.*

*FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Belhas v. Ya'Alon,* 515 F.3d 1279, 1281

(D.C. Cir. 2008) (examining materials outside the pleadings in ruling on a Rule 12(b)(1) motion

to dismiss for lack of subject matter jurisdiction); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (noting that courts may consider materials outside the pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction).

### B.      Motion to Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," to encourage brevity and, at the same time, "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipses in original; internal quotations and citations omitted); *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 319 (2007).   The Supreme Court has cautioned that although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).   To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Iqbal*, 556 U.S. at 678).   A claim is facially plausible when the plaintiff pleads factual content that is more than "merely consistent with a defendant's liability," and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).   Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action" to provide "grounds" of "entitle[ment] to relief," *Twombly*, 550 U.S. at 555 (alteration in original), and "nudge[ ] [the] claims across the line from conceivable to plausible," *id.* at 570.   Thus, "a

complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, even if doubtful in fact.  *Twombly* at 555; *Sissel v. United States HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014) (in considering Rule 12(b)(6) motion, the "court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor, but is not required to accept the plaintiff's legal conclusions as correct" (internal quotations and citations omitted)).  In addition, courts may "ordinarily examine" other sources "when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc.*, 551 U.S. at 322; *see also English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013)**.**

### C.    Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).  The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute.  *Celotex*, 477 U.S. at 323; *Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009). "Material facts are those that might affect the outcome of the suit under governing law; genuine issues are those in which the

evidence before the court is such that a reasonable trier of fact could find for the moving party."

*Hendricks*, 568 F.3d at 1012; *see also Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)

("A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law;

factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment

determination." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).

In ruling on a motion for summary judgment, the Court must draw all justifiable

inferences in favor of the nonmoving party and shall accept the nonmoving party's evidence as

true. *Liberty Lobby*, 477 U.S. at 255; *see also Grosdidier v. Broad. Bd. of Governors*, 709 F.3d

19, 23–24 (D.C. Cir. 2013). The Court is only required to consider the materials explicitly cited

by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV.

P. 56(c)(3). The nonmoving party must establish more than "[t]he mere existence of a scintilla

of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on mere

allegations or conclusory statements, *see Ass'n of Flight Attendants v. United States Dep't of*

*Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009); *Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C. Cir.

2006); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring); *Greene*

*v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *accord* FED. R. CIV. P. 56(e). Rather, the

nonmoving party must present specific facts that would enable a reasonable jury to find in its

favor. *See, e.g.*, FED. R. CIV. P. 56(c)(1); *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141

n.3 (D.C. Cir. 2011) (noting that at summary judgment stage, plaintiff "can no longer rest on

such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . .

which for purposes of the summary judgment motion will be taken to be true.'" (quoting *Sierra*

*Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002) (ellipsis in original))). "If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

## III.   DISCUSSION

The plaintiff brings four causes of action against the defendants.  In Counts I and IV, the plaintiff brings a *Bivens* claim against the individual defendants, alleging violations of the plaintiff's Fourth and First Amendment rights, respectively.  *See* Am. Compl. at ¶¶ 52–58, 66–69.  In Count II, the plaintiff challenges the maintenance of records pertaining to his First Amendment activities under the Privacy Act.  *Id.* at ¶¶ 59–62.  Finally, in Count III, the plaintiff asserts an APA challenge to the actions of the official capacity defendants in approving the warrantless use of the GPS device.  *Id.* at ¶¶ 63–65.  The Court first addresses the plaintiff's *Bivens* claims, before turning to the plaintiff's Privacy Act and APA challenges.

### A.   Qualified Immunity Shields the Individual Defendants from the Plaintiff's *Bivens* Claims

"Qualified immunity is 'a defense that shields officials from suit if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 183 (2011) (alterations omitted)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Since qualified immunity is "an *immunity from suit* rather than a mere defense to liability, . . . it is effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original).  Accordingly, a court must "resolv[e] immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This protection is afforded to government officials whether their "error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citations and internal quotation marks omitted); *see also Brinegar v. United States*, 338 U.S. 160, 176 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.").

"Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (brackets, internal quotation marks, and citation omitted). "To defeat a defense of qualified immunity, a plaintiff must show not only that an official 'violated a constitutional right' but also that 'the right was clearly established' at the time of the violation." *Fenwick v. Pudimott*, 778 F.3d 133, 137 (D.C. Cir. 2015). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-step analysis for resolving government officials' qualified immunity claims. First, a court must determine whether "the facts alleged show [that] the officer's conduct violated a constitutional right." *Id.* at 201. If the plaintiff satisfies this initial inquiry, the court then determines whether the right at issue was clearly established at the time of the alleged misconduct. *Id.* The sequence of this analysis is no longer mandatory, and now "lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Pearson*, 555 U.S. at 236); s*ee also Pudimott*, 778 F.3d at 137.

The Court finds that the individual defendants are entitled to qualified immunity on both of the plaintiff's *Bivens* claims because, as discussed more fully below, neither the Fourth Amendment nor First Amendment rights he seeks to vindicate in this suit were clearly established at the time and in the place where the challenge conduct occurred.

### 1.     *Fourth Amendment*

In the present case, the individual defendants do not address whether, under the Supreme Court's recent decision in *Jones*, the individual defendants' actions violated the Fourth Amendment.  *See* Def. Jennifer Kanaan's Reply Supp. Mot. Dismiss at 2, ECF No. 33 ("The issue currently before the court is not whether warrantless GPS monitoring was constitutional, but whether the law was so clearly established such that every reasonable officer would have known that the conduct was prohibited."); *see also* Mem. Supp. Def. Jennifer Kanaan's Mot. Dismiss at 5 n.3 (arguing that "this is a case in which it makes sense to proceed directly to the question whether the right asserted by Plaintiff was clearly established" and not addressing whether the individual defendants actions violated the Constitution).  The Court agrees that the threshold question is whether the individual defendants' actions violated clearly established law. *See Wesby v. District of Columbia*, 765 F.3d 13, 25 (D.C. Cir. 2014) ("'An officer is entitled to qualified immunity, despite having engaged in constitutionally deficient conduct, if, in doing so, she did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Brosseau v. Haugen*, 543 U.S. 194, 205 (2004))); *see also Harlow*, 457 U.S. at 818.  "Courts focus upon the state of the law at the time the action occurred because if the law at that time was not clearly established, then the official could not reasonably be expected to anticipate subsequent legal developments."  *Bame*, 637 F.3d at 387 (internal quotations and alterations omitted).  In making the determination of whether the law was clearly

established, it is important to note that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Al-Kidd*, 131 S. Ct. at 2085; *see also Messerschmidt*, 132 S. Ct. at 1244.  As a result, "[w]hen properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Al-Kidd*, 131 S. Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

   The plaintiff alleges that the individual defendants' conduct violated this high threshold. The plaintiff argues that at the time the individual defendants employed the GPS device, such warrantless use was deemed unconstitutional by this Circuit in *United States v. Maynard*, 615 F.3d 544, 555–56 (D.C. Cir. 2010) ("[W]e hold . . . [that] the police action was a search because it defeated Jones's reasonable expectation of privacy.").   *See* Mem. Opp'n to Def. Jennifer Kanaan's Mot. Dismiss ("Pl.'s Kanaan Opp'n") at 7, ECF No. 29.  The plaintiff also notes that for purposes of the qualified immunity analysis, a court ordinarily looks to "cases of controlling authority in [its] jurisdiction.'" *Id.* at 8 (quoting *Youngbey v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012)).  As a result, the plaintiff argues that the individual defendants' warrantless use of a GPS device was squarely in violation of binding Circuit precedent and therefore violated clearly established law.

   This argument ignores two salient features of the present dispute.  First, the Circuits were split regarding the constitutionality of the warrantless use of a GPS device at the time of the conduct at issue.  *See United States v. Jones*, 625 F.3d 766, 767 (D.C. Cir. 2010) (Sentelle, C.J., dissenting from the denial of rehearing *en banc*) ("In my view, this question should be reviewed by the court en banc because the panel's decision is inconsistent . . . with every other federal

circuit which has considered the case . . . .").[3]  Second, the warrantless use of a GPS device was

lawful under Ninth Circuit precedent at the time of its use in the present case.  In other words,

the individual defendants' warrantless use of the GPS device was valid in California, the

jurisdiction in which the individual defendants used the GPS device.  *See United States v. Pineda-*

*Moreno*, 591 F.3d 1212, 1217 (9th Cir. 2010) ("We conclude that the police did not conduct an

impermissible search of Pineda-Moreno's car by monitoring its location with mobile tracking

devices.").  Thus, not only were the Circuits split at the time of the individual defendants'

conduct, but the conduct was lawful in the jurisdiction in which it occurred.  Both factors favor

the grant of qualified immunity to the individual defendants.  As the Supreme Court explained in

*Wilson v. Layne*, 526 U.S. 603, 618 (1999), and reiterated subsequently, "[i]f judges thus

disagree on a constitutional question, it is unfair to subject police to money damages for picking

the losing side of the controversy."  *See also Pearson*, 555 U.S. at 223 (same); *Reichle v.*

*Howards*, 132 S. Ct. 2088, 2096 (2012) (same).

      To avoid the implication of the Circuit split, the plaintiff seizes upon *Youngbey v. March*

for the proposition that "'[i]n determining whether the legal rules at issue are clearly

established,'" a court must look only to cases of controlling authority in its own jurisdiction.[4]

*See* Pl.'s Kanaan Opp'n at 8 (quoting *Youngbey*, 676 F.3d at 1117).  Yet, *Youngbey* did not

address the issue of qualified immunity where the defendants acted in a jurisdiction different

---

[3] *Compare United States v. Pineda-Moreno*, 591 F.3d 1212, 1215-17 (9th Cir. 2010), *cert. granted & judgment vacated*, 132 S. Ct. 1533 (2012); *United States v. Marquez*, 605 F.3d 604, 609–10 (8th Cir. 2010); *United States v. Garcia*, 474 F.3d 994, 995-98 (7th Cir. 2007); *United States v. McIver*, 186 F.3d 1119, 1126 (9th Cir. 1999), *with Maynard*, 615 F.3d 544, 556 (D.C. Cir. 2010), *aff'd sub nom. United States v. Jones*, 132 S. Ct. 945 (2012).  Further underscoring the uncertainty nationwide regarding the issue, after the D.C. Circuit's opinion in *Maynard*, two other Circuits rejected the idea that GPS monitoring constitutes a search. *See United States v. Hernandez*, 647 F.3d 216, 221 (5th Cir. 2011); *United States v. Cuevas-Perez*, 640 F.3d 272, 275-76 (7th Cir. 2011) (Cudahy, J.), *cert. granted & judgment vacated*, 132 S. Ct. 1534 (2012); *Cuevas-Perez*, 640 F.3d at 276 (Flaum, J., concurring).

[4] Notably, in *Reichle v. Howards*, the Supreme Court declined to accept the proposition that a Circuit's own authority can be the dispositive source of clearly established law for purposes of qualified immunity.  *See* 132 S. Ct. at 2094 ("Assuming arguendo that controlling Court of Appeals' authority could be a dispositive source of clearly established law in the circumstances of this case . . .").

from the forum of the lawsuit.  In such situations, "[w]hen faced with inconsistent legal rules in different jurisdictions, national officeholders should be given some deference for qualified immunity purposes, at least if they implement policies consistent with the governing law of the jurisdiction where the action is taken." *Al-Kidd*, 131 S. Ct. at 2086–87 (Kennedy J., concurring). Indeed, the Supreme Court has described the refusal to grant qualified immunity as "especially troubling" where a defendant's actions "were lawful according to courts in the jurisdiction where he acted." *Stanton v. Sims*, 134 S. Ct. 3, 7 (2013) (reversing Ninth Circuit's refusal to grant qualified immunity).  A contrary rule would permit plaintiffs to forum shop and might otherwise deter "national officeholders . . . from full use of their legal authority." *Al-Kidd*, 131 S. Ct. at 2087 (Kennedy J., concurring).  Such deterrence warrants "caution by the Judicial Branch" in refusing to grant qualified immunity, "particularly in the area of national security." *Id.*

Applying these principals to the present case, the individual defendants are entitled to qualified immunity as their actions, in following the binding precedent of the relevant jurisdiction, were not "plainly incompetent" and did not violate clearly established law.[5]

### 2.   *First Amendment*

Although the precise scope of the plaintiff's First Amendment claim is unclear from the Amended Complaint, during briefing, the plaintiff clarified that his claim "pertain[s] to the manner and effect of the warrantless search itself and [his] ongoing fear that [the individual defendants] will resume their investigation or disclose his personal information to third parties." Pl.'s Kanaan Opp'n at 10.  The plaintiff expressly clarifies that his "First Amendment claims do not encompass the collection and maintenance of the information gathered through the GPS

---

[5] As the Supreme Court has recognized in the context of the exclusionary rule, "when binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities." *Davis v. United States*, 131 S. Ct. 2419, 2429 (2011) (emphasis in original).

surveillance. Instead, the First Amendment claims challenge the chilling effect the warrantless search had on his expressive and associational rights." *Id.* As formulated, the individual defendants are entitled to qualified immunity with regard to the plaintiff's *Bivens* claim for violations of the First Amendment. The plaintiff has failed to cite a single case from any Circuit holding that the warrantless use of a GPS device violates an individual's First Amendment rights. To be sure, the qualified immunity analysis does not require a "case directly on point," *Al-Kidd*, 131 S.Ct. at 2083, but a court must take caution in properly defining the scope of the right violated, *see id.* at 2084 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). In this regard, the plaintiff's silence is telling as "existing precedent must have placed the statutory or constitutional question beyond debate." [6] *Id.* The plaintiff's inability to cite a single case in support of his contention that the warrantless use of a GPS device violated his First Amendment rights dooms his claim. [7]

---

[6] The primary cases on which the plaintiff relies refer to violations of the Privacy Act. *See* Pl.'s Kanaan Opp'n at 12 (citing *Nagel v. United States Department of Health, Education, and Welfare*, 725 F.2d 1438, 1141 (D.C. Cir. 1984) ("The mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise."); *MacPherson v. IRS*, 803 F.2d 479, 484 (9th Cir. 1986)). These cases actually undermine the plaintiff's claim in the present case. To the extent the plaintiff argues that the compilation of records concerning the plaintiff's First Amendment activities chilled the exercise of his First Amendment rights, such a *Bivens* claim is otherwise encompassed by the remedial scheme of the Privacy Act and will not lie. *See, e.g.*, *Wilson v. Libby*, 535 F.3d 697, 707 (D.C. Cir. 2008) ("The failure of the Privacy Act to provide complete relief to the Wilsons, however, does not undermine its status as a 'comprehensive scheme' that stops us from providing additional remedies under *Bivens*."); *Chung v. United States Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003) ("We affirm the dismissal of Chung's constitutional claims because, as the district court correctly held, they are encompassed within the remedial scheme of the Privacy Act."); *Sudnick v. United States Dep't of Def.*, 474 F. Supp. 2d 91, 100 (D.D.C. 2007) ("Since the [Privacy] Act is a comprehensive statutory scheme that provides meaningful remedies for the kind of wrong plaintiff alleges, plaintiff may not proceed under *Bivens*.").

[7] The plaintiff's reliance on *Hartman v. Moore*, 547 U.S. 250 (2006) is misplaced. *See* Pl.'s Kanaan Opp'n at 11–12. *Hartman* concerned alleged government retaliation for the exercise of First Amendment rights. In evaluating the plaintiff's claim, *Hartman* recognized that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman*, 547 U.S. at 256. By contrast, in the present case, the plaintiff has not alleged that the GPS device was used as retaliation for any First Amendment activity, or even identified any First Amendment activity taken by the plaintiff prior to the installation of the GPS device. Although the plaintiff notes that he subsequently spoke with local and national media, *see* Am. Compl. at ¶ 48, the plaintiff has not identified any retaliatory action taken by the individual defendants following his discussions with the media.

The Court need not decide whether the individual defendants' warrantless use of a GPS device violated the plaintiff's First Amendment rights because the law regarding the issue was not clearly established at the time of the conduct. *See Pearson*, 555 U.S. at 236. As a result, qualified immunity shields the individual defendants from the plaintiff's First Amendment *Bivens* claim.

### B.  Privacy Act Challenge

In his second claim, the plaintiff alleges that, because of the GPS device, the Government currently maintains records of his First Amendment activities in violation of the Privacy Act, 5 U.S.C. §522a.[8]  *See* Am. Compl. at ¶¶ 59–62.

The Privacy Act "'safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that his records are accurate and properly used.'" *Cloonan v. Holder*, 768 F. Supp. 2d 154, 161 (D.D.C. 2011) (quoting *Henke v. Dep't of Commerce*, 83 F.3d 1453, 1456 (D.C. Cir. 1996)).  "To accomplish this goal, the Act 'gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements.'" *Id.* (quoting *Doe v. Chao*, 540 U.S. 614, 618 (2004)).  Section (e)(7) of the Privacy Act provides that a government agency "shall . . . maintain no record describing how any individual exercises rights

---

[8] Although the plaintiff's Amended Complaint purports to bring this claim against the individual defendants and the official capacity defendants, *see* Am. Compl. ¶¶ 59–62, a Privacy Act claim may only be brought against an agency. *See* 5 U.S.C. 552a(g)(1).  Thus, to the extent the plaintiff asserts a claim against the individual defendants under the Privacy Act, such claim is dismissed.  Likewise, the plaintiff may not bring suit under the Privacy Act against the official capacity defendants and must instead bring suit against the appropriate agency.  *See Martinez v. Bureau of Prisons*, 444 F.3d 620, 624 (D.C. Cir. 2006) ("[T]he district court properly dismissed the named individual defendants because no cause of action exists that would entitle appellant to relief from them under the Privacy Act or FOIA." (citations omitted)); *Dick v. Holder*, No. 13-cv-1060, 2014 WL 4450531, at *4 (D.D.C. Sept. 10, 2014).  Nonetheless, for the reasons explained, even were this Court to substitute the agency in place of the named official capacity defendants, the plaintiff's claim would still fail.

guaranteed by the First Amendment unless . . . pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a (e)(7).

The official capacity defendants seek summary judgment on the plaintiff's Privacy Act claim, arguing that that the collected records are "pertinent to and within the scope of an authorized law enforcement activity" and therefore do not violate the Privacy Act. *See* Mem. Supp. Defs. Holder and Mueller's Mot. Dismiss & Summ. J. at 11–15, ECF 25-1. The plaintiff opposes summary judgment, arguing that the record is insufficient to determine if the collection and maintenance of the plaintiff's records was pursuant to a valid law enforcement activity, that the collection violated the Fourth Amendment and was therefore *per se* unauthorized, that the records are not relevant on a continuing basis, and that policy concerns militate against permitting the maintenance of the plaintiff's records. *See* Mem. Opp'n Defs. Holder and Mueller's Mot. Dis. and Summ. J. ("Pl.'s Official Capacity Opp'n") at 13–25, ECF No. 30-1. The plaintiff's arguments are unavailing.

The official capacity defendants collected and maintained records of the plaintiff's First Amendment activities as part of an authorized law enforcement activity. "Although the Privacy Act does not define 'law enforcement activity,' [the D.C. Circuit has] interpreted the phrase broadly" to include "an authorized criminal, intelligence, or administrative investigation." *Maydak v. United States*, 363 F.3d 512, 517 (D.C. Cir. 2004) (citing *Nagel v. U.S. Dep't of Health, Educ. and Welfare*, 725 F.2d 1438, 1441 n.3 (D.C. Cir. 1984)). While the plaintiff argues that the present record is insufficient to determine whether the investigation was pursuant to an authorized law enforcement activity, *see* Pl.'s Official Capacity Opp'n at 16 (citing

*Maydak*, 363 F.3d at 517), the present record adequately demonstrates the validity of the investigation into the plaintiff for purposes of the Privacy Act.[9]

In *Maydak v. United States*, the D.C. Circuit assessed whether the Bureau of Prisons ("BOP") could main duplicate photographs of prisoners visiting with family, friends, and associates. 363 F.3d at 517. To determine whether the records complied with Section (e)(7) of the Privacy Act, the Court conducted a two-step inquiry. First, the Court examined the responsibilities of the BOP, noting that the "BOP has responsibility for preserving prison security." *Id.* Second, the Court examined whether the BOP's proffered explanation for the maintenance of the photographs was consistent with their institutional responsibilities. The Court determined that "examining photographs for conduct that may threaten [prison] security" and "reviewing inmate photographs for gang-related activity and obscene conduct" were consistent with the responsibilities of the BOP and would "easily" fall within the purview of Section (e)(7). *Id.* Nonetheless, according to the BOP's own declarations, the BOP also collected the materials for general "investigative or informative value," which purposes were too vague to permit the award of summary judgment. *Id.* As a result, the Court remanded the case with instructions to "determine, on the basis of a fuller record, whether . . . review of [the]

_____

[9] The plaintiff has requested an opportunity for discovery into the details of the initiation of the investigation of his activities, but such discovery is not proper under the Privacy Act. Instead, a court may decide the applicability of Section (e)(7) on the basis of the declarations submitted by the agency. This avoids placing "law enforcement agencies in the catch-22 of either divulging current investigatory activities or not asserting the law enforcement exception specifically provided in the Act." *Bassiouni v. FBI*, 436 F.3d 712, 722 n.7 (7th Cir. 2006). Where information is needed beyond the agency declarations, the appropriate remedy is the review of an *ex parte* classified submission—not discovery. *See J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600, 605 (D.C. Cir. 1996). In the present case, the official capacity defendants have submitted a sealed declaration in support of their motion for summary judgment further detailing the background of the investigation into the plaintiff. *See* Declaration of Joel D. Dabisch ("Sealed Dabisch Decl."), ECF No. 27-2. The official capacity defendants have also offered further substantiation of the declaration through a classified *ex parte* submission to the Court. The information contained in the sealed declaration is sufficient to determine that the records are within the scope of an authorized law enforcement activity. Nonetheless, it bears noting that to the extent the plaintiff seeks to vindicate his own actions or to otherwise discredit the initiation of the FBI's investigation through the use of discovery, the investigation is now closed and this Court is satisfied regarding the evidence giving rise to the FBI's investigation in the first instance.

photographs was consistent with an 'authorized law enforcement activity'" in light of the additional purposes for the collection.  *Id.*

A similar two step-inquiry in the present case reveals the records of the plaintiff's activities to have been collected as part of an "authorized law enforcement activity."  The FBI has "responsibility in investigating all crimes for which it has primary or concurrent jurisdiction and which involve terrorist activities or acts in preparation of terrorist activities . . . ."  28 C.F.R. §0.85(l).  Such responsibility includes "the collection, coordination, analysis, management and dissemination of intelligence and criminal information as appropriate."  *Id.*  Based upon the declaration submitted, the investigation into the plaintiff was fully consistent with the FBI's mission to investigate potential terrorist activities and a fuller record is unnecessary to determine that the collection of records was consistent with an authorized law enforcement activity.[10]  *See Maydak*, 363 F.3d at 517 ("Because BOP has responsibility for preserving prison security, we have no doubt that examining photographs for conduct that may threaten that security is pertinent to and within the scope of an authorized law enforcement activity.").

Nor does the Supreme Court's ruling in *Jones* alter this determination.  As discussed, *Jones* held that the warrantless use of a GPS monitoring device constitutes a search for purposes of the Fourth Amendment.  *See Jones*, 132 S. Ct. at 949.  The plaintiff argues that because the investigative tactic that led to the records was subsequently determined to be unconstitutional, the records cannot be "within the scope of an authorized law enforcement activity."  *See* Pl.'s Official Capacity Opp'n at 20–21.  As an initial matter, the D.C. Circuit has interpreted the phrase "law enforcement activity" to refer to criminal, intelligence, or administrative *investigations* and not each act taken in furtherance of that investigation.  *See Maydak*, 363 F.3d

---

[10] According to the sealed declaration, [REDACTED].

at 517.  Thus, the pertinent question is whether the investigation was valid and not whether every

act taken in furtherance of the investigation was valid.[11]  Second, even to the extent the focus of

the analysis should be on the specific investigatory tactic, as opposed to the investigation as a

whole, the relevant analysis must focus on the investigatory tactic at the time of its use, not at

some arbitrary future date.  "[T]he Privacy Act does not prohibit an agency from maintaining

records about an individual's first amendment activities if the information was pertinent to an

authorized law enforcement activity *when the agency collected the information*." *J. Roderick*

*MacArthur Found. v. FBI,* 102 F.3d 600, 603 (D.C. Cir. 1996) (emphasis added).  As discussed

above, in the present case, the plaintiff's information was collected prior to the Supreme Court's

decision in *Jones* and was valid under then-existing law in the jurisdiction of collection.

Accordingly, even to the extent the proper inquiry should focus on the investigative tactic used to

collect the records, the collection of the plaintiff's records in this case was valid under the

precedent of the jurisdiction where it was collected.

    In addition, the fact that the investigation into the plaintiff is now closed does not render

the records invalid under Section (e)(7).  The D.C. Circuit has held that an agency may maintain

records from an authorized investigation even after that investigation was closed, because

"[m]aterials may continue to be relevant to a law enforcement activity long after a particular

investigation undertaken pursuant to that activity has been closed . . . ."  *J. Roderick MacArthur*

*Found.,* 102 F.3d at 602; *see also id*. at 603 ("Information that was pertinent to an authorized law

enforcement activity when collected does not later lose its pertinence to that activity simply

because the information is not of current interest (let alone 'necessity') to the agency.").  The

present case is no different.  The records now in the FBI's possession may permit the FBI to

---

[11] Indeed, where the use of an investigative tactic violates the Constitution, the ordinary remedy is to exclude the evidence from any subsequent trial, not to invalidate the entire investigation.

verify or evaluate any new intelligence received, assess the reliability of other sources, and ensure accountability regarding how the FBI responded to the information it received.  *See* Unsealed Dabisch Decl. at ¶ 13.  In *Bassiouni v. FBI*, 436 F.3d 712, 718–19 (7th Cir. 2006), the Seventh Circuit upheld the FBI's maintenance of records concerning the First Amendment activities of a DePaul University law professor even though the FBI "concede[d] that it does not suspect him of ties to terrorist groups."  Nonetheless, the Seventh Circuit concluded that the files might be relevant to ongoing authorized investigations for the same reasons provided here: corroboration of new evidence and evaluation of the reliability of other sources.  *See id.* at 724. The court concluded that maintaining the records for such purposes constituted an "authorized law enforcement activity."  *Id.*

Finally, the plaintiff cautions against the policy consequences of permitting the FBI to maintain the plaintiff's records in the present instance, warning of a "broad 'chilling effect' on people's First Amendment rights."  Pl.'s Official Capacity Opp'n at 23.  Although mindful of the plaintiff's concern, Congress has set out a binding legal balance between the sometimes competing interests of protecting First Amendment activity and protecting national security. Section (e)(7) of the Privacy Act reflects this congressional balancing:  The records of an individual's First Amendment activities may not be kept by a government agency except when "pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7).  As discussed above, the records of the plaintiff fall within the protections afforded by the statutory scheme.

The defendants have demonstrated that the records of the plaintiff's First Amendment activities complied with Section (e)(7) of the Privacy Act, and summary judgment is granted to the official capacity defendants with respect to the plaintiff's Privacy Act claim.[12]

### C.    APA Challenge

Before the Court may address the merits of the plaintiff's APA challenge, the Court must first resolve the threshold question of whether the plaintiff maintains standing to seek injunctive relief.  As discussed below, the Court concludes that the plaintiff lacks standing to seek prospective injunctive relief under the APA.

Article III of the Constitution restricts the power of federal courts to hear only "Cases" and "Controversies."  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (alterations in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The Supreme Court has explained that "the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.  A claimant must show: (1) he or she has suffered an "injury in fact" that is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical;" (2) there must be "a causal connection between the injury and the conduct complained of" such that the injury is "fairly . . . trace[able] to the challenged action of the defendant;" and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotations omitted).  In short, "[t]he plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to

---

[12] As a result, the Court need not reach the official capacity defendants' alternative argument that the plaintiff may not seek expungement of the records in question.  *See Bassiouni*, 436 F.3d at 724 ("[W]e need not reach the question of whether expungement is a proper remedy because, as demonstrated below, we believe that the FBI's maintenance of Mr. Bassiouni's records in this case complies with the requirements of § 552a(e)(7).").

the challenged action of the defendant and likely to be redressed by a favorable judicial

decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014).

Importantly, "a plaintiff must demonstrate standing for each claim he seeks to press and for each

form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)

(internal quotations omitted).

When a plaintiff seeks prospective declaratory or injunctive relief, allegations of past

harms are insufficient. *See Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). Rather, when

declaratory or injunctive relief is sought, a plaintiff "must show he is suffering an ongoing injury

or faces an immediate threat of [future] injury." *Id.* (citing *City of Los Angeles v. Lyons*, 461

U.S. 95, 105 (1983)). "'Although imminence is concededly a somewhat elastic concept, it

cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too

speculative for Article III purposes . . . .'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147

(2013) (quoting *Lujan*, 504 U.S. at 565 n.2). In this Circuit, "[a] plaintiff must show a

'substantial probability of injury' to establish imminent injury."[13] *Sierra Club v. Jewell*, 764

F.3d 1, 7 (D.C. Cir. 2014) (quoting *Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 200

(D.C. Cir. 2011)). Accordingly, when a plaintiff seeks injunctive or declaratory relief

specifically for the purpose of challenging an alleged policy or practice of a government agency,

the plaintiff must demonstrate that it is "'realistically threatened by a repetition of [its]

experience.'" *Haase v. Sessions*, 835 F.2d 902, 910–11 (D.C. Cir. 1987) (quoting *Lyons*, 461

U.S. at 109). To plead a "threat of repetition," a plaintiff must make "more than a nebulous

---

[13] In *Clapper v. Amnesty Int'l USA*, the Supreme Court described the imminence requirement as supporting a "certainly impending" standard, but noted that prior precedent had sometimes required a showing of only "substantial risk." 133 S. Ct. at 1150 n.5. Under the facts of *Clapper*, the Court concluded that "to the extent that the 'substantial risk' standard is relevant and is distinct from the 'clearly impending' requirement, respondents fall short of even that standard . . . ." *Id.* Although *Clapper* appeared to distinguish the "certainly impending" and "substantial risk" standards, the D.C. Circuit has interpreted *Clapper* to require a showing of a "substantial probability of injury." *See Sierra Club*, 764 F.3d at 7 (citing *Clapper*, 133 S. Ct. at 1150 & n.5).

assertion of the existence of a 'policy,'" and that it is "likely to be subjected to the policy again."
*Id.* at 911. This threat must be "real and immediate," or, alternatively, "realistic[ ]" in nature.
*See Lyons*, 461 U.S. at 102–106; *Golden v. Zwickler*, 394 U.S. 103, 109 (1969).

The plaintiff puts forward three allegations of harm in support of his APA claim.  First,
the plaintiff has "alleged a past violation of his rights by [the official capacity defendants]."  *See*
Pl.'s Official Capacity Opp'n at 5.  Second, the plaintiff alleges that "employers are denying him
employment on discovering the fact that [the individual defendants] searched him."  *Id.*  Third,
the plaintiff alleges "a future danger of Defendants tracking him through similar means."  *Id.*  In
support of his third allegation, the plaintiff notes that the "FBI expressed an ongoing interest in
[the plaintiff] immediately prior to the litigation."  *Id.*

With respect to the plaintiff's first argument, a prior violation of his rights by the
official capacity defendants will not suffice to confer standing for him to seek prospective relief.
*See Dearth*, 641 F.3d at 501 (requiring a plaintiff to "show he is suffering an ongoing injury or
faces an immediate threat of [future] injury" when seeking prospective relief).  In contrast, the
plaintiff's third alleged injury—the "future danger" of the defendants once again attaching a GPS
device to his car without a warrant—is too speculative to support standing in the present case.

On this point, the Supreme Court's decision in *City of Los Angeles v. Lyons* is instructive.
In *Lyons*, the plaintiff was stopped by four police officers and, "without provocation or
justification," the police officers "applied a chokehold" to the plaintiff.  461 U.S. at 97–98.  The
plaintiff sought damages and an injunction against the city of Los Angeles from using
"chokeholds," which the plaintiff alleged were permitted under city policy in certain limited
circumstances.  *Id.*  The Supreme Court held that the plaintiff lacked standing to seek an
injunction because "[t]here was no finding that [the plaintiff] faced a real and immediate threat

of again being illegally choked." *Id.* at 110.  So too here.  In the present case, the investigation

into the defendant is closed, *see* Unsealed Dabisch Decl. at ¶ 10, and the practice of which the

defendant complains is now subject to constitutional scrutiny as a "search," *see Jones*, 132 S. Ct.

945.  Both facts decrease the likelihood that the complained-of action will be repeated.

 Moreover, *Jones* does not bar the use of a GPS device as an investigative tactic

altogether.  *Id.*  Thus, the plaintiff must show that there exists both a substantial probability that

the Government will employ a GPS device against him again and a substantial probability that

the Government will do so without a warrant or not otherwise in accordance with constitutional

protections.  The plaintiff has offered no such evidence.  Although the plaintiff notes that the FBI

has subsequently contacted his counsel regarding a possible interview of the plaintiff, the

plaintiff offers no credible explanation for how a request to counsel for an interview suggests a

substantial probability that a GPS device will again be attached to his automobile.  *See* Am.

Compl. at ¶ 57 ("[The plaintiff] ascertains a future danger of Defendants again attaching a

tracking device to his vehicle.  This belief has an objective basis insofar as an FBI agent

contacted [the plaintiff] through counsel . . . to ask for an interview.").

 The plaintiff's second allegation—that he experiences an ongoing injury because

employers are denying him employment upon discovery of the FBI's investigation—presents a

different problem.  The injury is self-inflicted.  The D.C. Circuit has "consistently held that self-

inflicted harm doesn't satisfy the basic requirements for standing." *Nat'l Family Planning &*

*Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006); *J. Roderick*

*MacArthur Found.*, 102 F.3d at 606; *Ellis v. Comm'r of Internal Revenue Serv.*, No. 14-0471,

2014 WL 4557643, at *9 (D.D.C. Sept. 16, 2014) ("[I]t is well-settled in this jurisdiction that

self-inflicted injuries—injuries that are substantially caused by the plaintiff's own conduct—

sever the causal nexus needed to establish standing."). After discovering the GPS device, the plaintiff contacted local and national media to share his story. *See* Am. Compl. at ¶ 48. The plaintiff's potential employers only discovered that the plaintiff was a subject of an FBI investigation because of the plaintiff's own self-identification as a subject of an FBI investigation. Any injury to the plaintiff as a result was self-inflicted and will not suffice to confer standing on the plaintiff.

The plaintiff's second standing theory suffers from an additional flaw. A ruling by this Court in favor of the plaintiff will not redress his alleged grievance because the alleged harm results from the independent actions of third parties not before the Court—the prospective employers. "[S]tanding to challenge a government policy cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling." *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1274 (D.C. Cir. 2007). The D.C. Circuit has identified "two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party." *Id.* at 1275. "First, a federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *National Wrestling Coaches v. United States Dep't of Educ.*, 366 F.3d 930, 940 (D.C. Cir. 2004). Second, standing has been found "where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Id.* at 941. The plaintiff's complaint falls into neither category as the challenged policy at issue does not authorize employers to take any action whatsoever with regard to the plaintiff's employment, nor has the plaintiff submitted any evidence to suggest that employers would alter their behavior in light of any ruling by this Court.

Instead, this Court is left to speculate regarding the independent actions of third parties.  Such speculation does not suffice to confer standing.

In sum, the plaintiff cannot establish standing to pursue his claims for prospective relief and therefore his claim for prospective relief under the APA is dismissed for lack of standing.[14]

## IV.    CONCLUSION

For the foregoing reasons, the individual defendants' motion to dismiss is granted and the official capacity defendants' motion to dismiss and for summary judgment is granted.  An appropriate Order accompanies this memorandum opinion.

Date: April 30, 2015

_____
BERYL A. HOWELL
United States District Judge

---

[14] Even if the plaintiff were able to establish standing to pursue his claim for prospective relief, the plaintiff's claim under the APA fails to challenge final agency action as contemplated by the APA. The plaintiff argues that "[t]he authorization and placement of the warrantless tracking device on [the plaintiff's] vehicle is a 'circumscribed, discrete' agency action specific to [the plaintiff]." Pl.'s Official Capacity Opp'n at 11.  "'Agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . . ." 5 U.S.C. § 551(13); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004).  The authorization or use of a GPS device does not fall within any of these categories nor is it the "equivalent . . . thereof."  A law enforcement agency's approval of the use of a specific investigative technique in the context of a specific investigation does not constitute final agency action within the meaning of the APA.  *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("The agency's conduct thus far amounts to an investigation of appellant's sprinkler heads . . . [and such] agency activities do not constitute final agency action within the meaning of the APA . . . ."); *see also ACLU v. NSA*, 493 F.3d 644, 678 (6th Cir. 2007) ("The plaintiffs challenge the NSA's warrantless interception of overseas communications, the NSA's failure to comply with FISA's warrant requirements, and the NSA's presumed failure to comply with FISA's minimization procedures. This is conduct, not 'agency action.' Furthermore, there is no authority to support the invocation of the APA to challenge generalized conduct.").